IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JACOB BARRETT**,                                          Civil Case No. 06-510-JE

                    Plaintiff,

                                                            OPINION AND ORDER

        vs.

**BRIAN BELLEQUE**, et al.,

                    Defendants.


        Ryan S. Gibson
        Andrea H. Thompson
        Stoel Rives LLP
        900 SW 5th Avenue, Suite 2600
        Portland, Oregon  97204

        Leonard J. Feldman
        Stoel Rives, LLP (Seattle)
        600 University Street, Suite 3600
        Seattle, Washington  98101

                Attorneys for Plaintiff


Page 1 - OPINION AND ORDER

Jacqueline Sadker Kamins
Samuel A. Kubernick
State of Oregon
Department of Justice
1162 Court Street, NE
Salem, Oregon  97301

      Attorneys for Defendants

KING, Judge:

The Honorable John Jelderks, United States Magistrate Judge, filed Findings and Recommendation on October 27, 2010.  The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure.  Decisions on dispositive issues under 28 U.S.C. § 636(b)(1)(B) are reviewed de novo. United States v. Raddatz, 447 U.S. 667, 673 (1980); Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1414 (9th Cir. 1991). When a party objects to any portion of the Magistrate's Findings and Recommendation, the district court must make a de novo determination of that portion of the Magistrate's report.  28 U.S.C. § 636(b)(1)(B);  United States v. Remsing, 874 F.2d 614 (9th Cir. 1989).

Plaintiff Jacob Barrett has filed timely objections to the Magistrate Judge's recommendation that his motion for partial summary judgment be denied and that defendants' motion for summary judgment be granted.  I have, therefore, reviewed the Findings and Recommendation de novo.

Barrett is an inmate formerly housed by the Oregon Department of Corrections ("ODOC").  He brought this action for declaratory and injunctive relief and money damages under 42 U.S.C. § 1983,  asserting that sanctions imposed on Barrett by ODOC personnel, as a consequence of comments Barrett made in letters to family members, violated his rights under

Page 2 - OPINION AND ORDER

the First and Fourteenth Amendments to the United States Constitution.  The Magistrate Judge

has recommended that 1) defendants' motion for summary judgment on all of Barrett's claims be

granted; and 2)  Barrett's motion for partial summary judgment challenging the lawfulness of the

ODOC rules as applied be denied.

## FACTUAL BACKGROUND

Barrett was convicted of aggravated murder and robbery, and was admitted to the custody

of the Oregon State Penitentiary ("OSP") on December 5, 1995.  He has a history of violence and

misconduct in prison, and has been incarcerated many times in the Intensive Management Unit

("IMU"), a special unit that houses inmates receiving maximum supervision.  Barrett has

threatened defendant Nofziger with physical harm.  Barrett was transferred to a prison in

Oklahoma on May 15, 2007.

ODOC identified Barrett as a member of the Aryan Soldiers Branch ("ASB"), a white

supremacist security threat group ("STG").  Barrett does not deny that he has been an ASB

member, although he asserts that he renounced his membership in 2006.

All inmate incoming and outgoing mail is subject to examination by ODOC personnel,

and Barrett was aware of this.  In late 2005, Barrett wrote three letters.  The first was addressed

to his grandmother, and the second and third were addressed to his mother.  The letters were

opened by an unidentified mailroom staff employee, who read them and forwarded them to

defendant Nofziger.  In the first letter, Barrett wrote that an "unnamed mailroom censor was a

WHORE . . . I think she is a nigger . . . Nofnigger has a kike look to[] him a small frail Semitic

body type ... Nofnigger is a real prize PUNK.  That little HOMOSEXUAL considers himself a

junior FBI agent . . . Nofziger is a punk!  That WHORE in the mailroom is just as bad.  And this

Page 3 - OPINION AND ORDER

hearings officer is a TOTAL FUCKING IDIOT! . . . Can't let these DICK SUCKING NIGGER

Punks, bother me too much."  Findings and Recommendation at. 4.

As a result of this letter, Barrett was sanctioned on November 4, 2005 for violating

ODOC Rule 2(d) (Disrespect I) and Rule 4(b)(B) (Disobedience of an Order II).  The first of

these Rules prohibits inmates from directing hostile, abusive, sexual, or threatening language or

gestures, verbal or written, toward or about another person, involving racial, religious or sexual

harassment, or a physical threat to another person.  See OAR 291-105-0028(4).  The second Rule

prohibits creation of a threat to the safety, security, or orderly operation of the prison facility

through failure to comply with a valid order.  Barrett was fined $75 and lost certain privileges for

14 days.

In the second letter, Barrett wrote, "I guess they hate me because I'm a White Power

Skinhead-- 1488!"[1]  Id. at p. 5.  Barrett drew several swastikas throughout the letter.  He also

wrote about Earl Krugel, a Jewish Defense League member who had been murdered in prison in

Phoenix, Arizona, on November 5, 2005:

Funny this is, they just murdered Earl Krugel, former JDL member in federal prison.

Crushed his head with a cinder block.  Good times!  There really is justice in this world.

Heil Hitler [followed by drawing of a swastika] 1488.  That really does a heart good to

---

[1] The Magistrate Judge found, based on the declaration of Dennis Long, a Correctional
Captain at OSP who has worked as the OSP STG Manager, that the number "14" is used to
describe a phrase frequently used by neo-Nazis and white supremacists, and "14 Words" or "14
W" is used to affirm an affiliation with white supremacy.  The 14-word phrase is, "We must
secure the existence of our people and a future for white children."  According to Long, "88" is
used to represent the letter "H," the eighth letter of the alphabet, repeated twice, to stand for "Heil
Hitler," and can also represent a book called "88 Precepts," which was written by David Lane, the
deceased leader of The Order, a white supremacist organization.  Long states that the numbers
"14" and "88" are sometimes combined.

Page 4 - OPINION AND ORDER

know a scumbag like that got his dues.  I sure would like to shake the hand of the POW

who crushed that Kikes head in like a grape.  White Power!  White Pride!  1488 Love

Jacob.

Id.

On November 11, 2005, Barrett received a misconduct report based on the second letter,

and was sanctioned for violating ODOC Rule 4(o) (Unauthorized Organization II) and Rule

4(b)(B) (Disobedience of an Order II).  The first of these Rules prohibits the support, display, or

endorsement, through verbal, visual, or written communication, of any club, association, or

organization which is a STG.  See OAR 291-105-0015(4)(o); OAR 291-105-0028(4).  Barrett

was fined $75 and lost privileges for an additional 14 days.

In the third letter, Barrett wrote,

Well officer dipshit struck again.  Cpl. Nofziger wrote me another misconduct for an

outgoing letter . . . I'd like to get Nofnigger into a boxing ring so I could legally beat his

ass . . . People like Nofnigger make me hate not only the system, but those in it . . . Then

you get these homosexual punks like Nofnigger who have no social skills, no education

worth speaking of and due to his personal inferiorities, uses his "job" to abuse people.

The little semitic looking punk has a job as a guard!

Id. at 6.  Barrett again wrote about Jewish inmates in other prisons:

Then in 2001, him and the other kike Irv Rubin.  After they were arrested the kike Rubin

cut his own throat and jumped off the top tier of a California holding center.  Sad thing is

he didn't give a good POW the opportunity to do it!  But Krugels kike ass got what was

coming to him.  He got sentenced in September.  Three days after he got to prison,

someone crushed his head with a cinder block.  Now THAT is justice.  The atrocities that

Krugel and Rubin committed are too long to list.  Let that be sure.  To long to put in print.

Cant say their history is too much different than Nofzigers or any of those "white" cops

(Nofziger is actually a Jew which probably accounts for his hate for me.)  That why I

cheerfully think about Rubin and Krugel now.  It shows good things do happen to bad

people.

Id. at 6-7.  (Errors in original.)

On November 16, 2005, Barrett received a misconduct report based on the third letter,

and was sanctioned for violating Rules 4(o) (Unauthorized Organization II) and Rule 2(d)

(Disrespect I).  He was fined $50 and lost privileges for an additional 14 days.

## PROCEDURAL BACKGROUND

Barrett brought this action on April 14, 2006.  In an Order and Judgment, both entered

June 13, 2006, the court dismissed the action with prejudice for failure to state a claim upon

which relief could be granted.  (Doc. ## 8, 9).

The court noted that Barrett had recently filed a very similar case, Barrett v. Belleque, et

al., CV No. 05-1774-CO, which had been dismissed for failure to state a claim.  In that case,

Barrett had been sanctioned for writing a letter to his grandmother in which he referred to a

prison mailroom censor as a "whore, nigger loving whore, moron and stupid."  Id. (doc. # 5).

Magistrate Judge Cooney recommended dismissal on the ground that there was no constitutional

violation because Barrett was aware that his mail was being read by correctional officers.

Page 6 - OPINION AND ORDER

District Judge Hogan adopted Judge Cooney's Findings and Recommendation.

In the June 13, 2006 Order dismissing this case for failure to state a claim, the court concluded that the rules applied by ODOC to sanction Barrett for statements made in the three letters were reasonably related to the legitimate penological objective of prohibiting racist and insulting language directed at correctional officials. Accordingly, because prison inmates retain only those First Amendment rights that are not inconsistent with their status as prisoners or the legitimate penological objectives of the institutions in which they are confined, Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125 (1977), Barrett had failed to state a claim for deprivation of his First Amendment rights.

Barrett appealed the June 13, 2006 Order and Judgment. (Doc. # 10). The Court of Appeals reversed on September 22, 2008. Barrett v. Belleque, 544 F.3d 1060 (9th Cir. 2008) (per curiam). The court held:

> The standards for evaluation of a First Amendment claim concerning outgoing correspondence sent by a prisoner to an external recipient were established by the Supreme Court in Procunier v. Martinez, 416 U.S. 396 (1974), *overruled on other grounds by* Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). [Parallel citations omitted]. Under these standards, censorship of prisoner mail is justified only if "the regulation or practice in question [] further[s] an important or substantial governmental interest unrelated to the suppression of expression" and "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." Id. at 413. [Parallel citation omitted]. Procunier is controlling law in the Ninth Circuit and elsewhere as applied to claims involving outgoing prisoner mail. Bradley v. Hall, 64 F.3d 1276, 1281 n.2 (9th Cir. 1995); Loggins v. Delo, 999 F.2d 364, 366 (8th Cir. 1993); Brooks v. Andolina, 826 F.2d 1266, 1268-69 (3d Cir. 1987); McNamara v. Moody, 606 F.2d 621, 624 (5th Cir. 1979).
>
> Barrett's complaint--which unequivocally pleads facts alleging that the prison censored his outgoing mail and punished him for its contents--states a claim that is clearly cognizable under Procunier. . . .
>
> Instead of analyzing Barrett's claim under Procunier, which is precedent that takes

account of the fact that the recipient's First Amendment rights are implicated when outgoing prisoner mail is censored, the district court relied on case law addressing prison regulations that concern communications between prisoners. See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119 (1977); see also Turner v. Safley, 482 U.S. 78 (1987). These authorities are not controlling here.

544 F.3d at 1062.

## STANDARDS

In Procunier, the Court recognized that communications between inmates and outside correspondents implicate the First Amendment rights of both groups. 416 U.S. at 408-09. The rights are implicated equally regardless of whether the outsider is the sender or the recipient. Id. The Court articulated the following rule governing the First Amendment rights of inmates and outside correspondents:

> [C]ensorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

Id. at 413-14. The Court rejected the argument that mail containing "disrespectful comments" or "derogatory remarks," or statements that "magnify grievances" or "unduly complain" could be censored "as a precaution against flash riots and in furtherance of inmate rehabilitation." 416 U.S. at 415-16. The Court noted that prison officials had not given any indication of what causal relationship existed between such mail and such results.

In Bradley, an inmate submitted a written grievance which contained the following

Page 8 - OPINION AND ORDER

language:

> Her [the guard's] actions shows her misuse of her authority and her psychological disorder needs attention.  Then you wonder why things happen like that guard getting beat down?  I suggest you talk to this woman and have her act professionally instead of like a child.

64 F.3d at 1278.  Bradley was punished for violating OAR 291-105-015(2)(g) (Disrespect III). He brought a civil rights action challenging the validity of the disrespect rules as applied to statements made in a written grievance.  Id. at 1278-79.  The district court ruled that  "[p]risoners should be allowed to file grievances within the prison system without fear of being sanctioned for an unhappy choice of words, except to the extent that [the words include] criminal threats."  Id. at 1279.  The Court of Appeals affirmed.

In its opinion, the Court of Appeals acknowledged "the prison's valid interest in the peaceable operation of the prison through the insistence on respect," but found the "link between this important purpose and the disrespect rules as applied to formal written grievances is weak." Id. at 1281.  The court continued, "The director and his experts argue that to permit the utterance of disrespectful language in *any* forum at *any* time would result in a total breakdown of prison security and discipline.  Other courts that have addressed this argument in similar contexts have rejected it."  Id. (emphasis in original.)  The court cited the Eighth Circuit's decision in Loggins, holding that statements in a prisoner's letter to his brother did not implicate prison security concerns, and that the application of disrespect rules to the letter violated the First Amendment. The Bradley court recognized that in Loggins the court "was applying the more stringent test under Procunier used to judge censorship of a prisoner's outgoing mail," [2] but held that "the

---

[2] The more stringent Procunier standard applies to the instant case as well, since this case also involves outgoing mail rather than communications made or directed toward prison

reasoning of that opinion regarding the low security risk posed by written material not addressed to prison officials applies with equal force here."  Id. at 1281n. 2.

In Loggins, an inmate had written a letter to his brother which, pursuant to prison procedure, had been opened and read by a mailroom clerk.  The letter said, in part, that "[t]here's a beetled ey'd bit-- back here who enjoys reading people's mail."  999 F.2d at 365.  The letter went on to say that the "bit--" was a "dyke" and "[wa]s hoping to read a letter someone wrote to their wife talking dirty sh--, so she could go in the bathroom and masturbate."  Id.  Loggins was disciplined for "using abusive or obscene language . . . or making a written statement intended to annoy, offend or threaten."  Id.

The court held that because the language in Loggins' letter to his brother did not implicate security concerns, the disciplinary action violated Procunier.  The court observed,

> This case is virtually identical to McNamara v. Moody, 606 F.2d 621 (5th Cir. 1979).[3]
> The Fifth Circuit found that although the remarks were "coarse and offensive," the
> official's refusal to mail the letter violated [Procunier].  The court rejected the argument
> that "to allow letters like this would result in 'a total breakdown in prison security and
> discipline [,]" noting the argument was "similar to the contentions made by prison
> officials in [Procunier] and found unpersuasive by the Supreme Court."  In response to

personnel.

[3] In McNamara, an inmate wrote to his girlfriend:
I wish I could write w/o some perverted dung-hole reading my words, but such is not the
case.  It is really a shame that there are those who have such a blah ! life that they must
masturbate themselves while they read other people's mail.  I don't think the guy is
married; however one of the freeman told me the other day that he has a cat and that he is
suspected of having relations of some sort with his cat.  If the shoe fits him, watch him
blush the next time we see him.  I'll point him out to you and you can laugh at him.  Look,
honey.  There goes that pervert who has sex with a cat and masturbates while reading
other people's mail."  This is what I think of him.  These are my thoughts, and I am
entitled to them.

606 F.2d at 623 (errors in original).

Page 10 - OPINION AND ORDER

the argument that the inmate could have been punished if the remarks had been "made orally to prison guards, face to face," the court stated:  "This may be so; we need not decide it.  These remarks were in writing and were directed toward the inmate's girlfriend, not the prison staff."  Such is also the case here.

999 F.2d at 367 (internal citations omitted).

The Loggins court also cited Brooks, where the Third Circuit had held that disciplinary action based on an outgoing letter stating that a guard had searched a visitor in "a very seductive manner" violated Procunier because "security concerns raised by the defendants are merely a belated attempt to justify their actions."  Id. at 368.

### DISCUSSION

The Barrett court's holding, citing Procunier as "controlling law in the Ninth Circuit and elsewhere as applied to claims involving outgoing prisoner mail," and then citing, without additional comment, the cases of Bradley, Loggins, Brooks and McNamara, is somewhat cryptic. The sentence can be read as meaning that Procunier is controlling law with respect to outgoing prisoner mail, with  Bradley, Loggins, Brooks and McNamara cited as support for that statement. Or the sentence can be read to mean that Procunier, as further elaborated in Bradley, Loggins, Brooks and McNamara  is controlling law in the Ninth Circuit.

The Magistrate Judge's Findings and Recommendation is consistent with the first reading; Barrett's objections to the Findings and Recommendation are based on a reading of Barrett consistent with the second interpretation.  If, under the second interpretation,  Procunier and Bradley, Loggins, McNamara and Brooks constitute the applicable standard,  a court could conclude that disrespectful statements about prison personnel made in outgoing correspondence do not implicate a substantial interest in prison security and discipline.  See, e.g., Loggins, 999

Page 11 - OPINION AND ORDER

F.2d at 367 (remarks in writing about prison staff directed toward inmate's girlfriend, not prison

staff, did not implicate security concerns); Bradley, 64 F.3d at 1281 n. 2 ("the low security risk

posed by written material not addressed to prison officials applies with equal force" to a

grievance made or directed toward the prison). .

However, such a conclusion is not necessarily compelled in this case.  In Bradley, the

district court had held that prisoners should not fear sanctions for an "unhappy choice of words,

*except to the extent that [the words include] criminal threats,"*  64 F.3d at 1279,  a holding

affirmed by the Court of Appeals.  (Emphasis added)  Unlike Bradley, this case involves words

that are direct or implied threats.  Barrett wrote, "I'd like to get Nofnigger into a boxing ring so I

could legally beat his ass," and, after discussing how "the kike Rubin cut his own  throat" and

Krugel's head had been crushed "like a grape" with a cinder block, Barrett said,  "[c]ant say

[Krugel and Rubin's] history is too much different than Nofzigers . . . .  That[] why I cheerfully

think about Rubin and Krugel now." Barrett's previous threats against Nofziger, and his

association with an STG, create a reasonable inference of threat, thereby placing Barrett's

communications factually outside the Bradley holding.

Additionally, a case decided by the Eighth Circuit after Loggins and cited by the

Magistrate Judge in the Findings and Recommendation, suggests that this case is factually

distinguishable from Loggins.  In Leonard v. Nix, 55 F.3d 370, 375 (8th Cir. 1995), the court

held that prison officials did not violate Leonard's First Amendment rights when they disciplined

him for writing letters to a former inmate, purportedly as "jailhouse lawyer communications,"

referring to the Warden as a "nigger," and a "black bastard," and saying, "The chief nigger and

his white boy gang will go down in flames."  55 F.3d at 371.  The court expressed doubt about

whether the speech at issue was protected by the First Amendment because "hate speech constitutes no essential part of any exposition of ideas," but held that even if it were, the letters were "not genuine, personal outgoing mail but were in fact diatribes directed at and toward the warden and the prison staff as a vehicle of protest." Id. at 374-75. The court concluded that Leonard "was, in fact, flouting the system and exploiting the First Amendment by directing written verbal abuse at and toward the warden through these purported jailhouse lawyer communications and then claiming First Amendment protection for his misconduct," and noted that there was "little doubt that the same language, if spoken by Leonard directly to the warden, would result in justifiable disciplinary action to preserve discipline and order." Id. at 375. The court also observed,

> There is also little doubt that Leonard is attempting to use this court not as a means of protecting his right to engage in the free interchange of ideas, which is the founding purpose of the First Amendment's guarantee of free speech, but as a means of ensuring for himself the special privilege of directly attacking the warden with written racial epithets without disciplinary consequence. We are convinced that there is a fundamental distinction that can be drawn in the prison context between permissible and constitutionally protected "unflattering" remarks about prison staff in personal correspondence directed to a recipient on the outside, and impermissible written abusive language that is directed not to the addressee but at and to the warden. The type of hate speech Leonard direct at Warden Nix is of such slight social value as a step to truth that any benefit that may be derived from it is clearly outweighed by the social interest in order and morality. . . . Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution.

55 F.3d at 375. The court went on to distinguish Loggins, McNamara and Brooks on the ground that Leonard "did not merely know that the letter might be read, instead he directed his defamatory and abusive comments expressly to the warden and staff for the purpose of making his feelings known *to them*." Id. (Emphasis in original). The Magistrate Judge applied the same rationale to this case.

Page 13 - OPINION AND ORDER

The court finds it unnecessary to decide whether, under this line of cases, Barrett's First Amendment rights were violated. Because the Magistrate Judge awarded the defendants summary judgment, he did not reach the question of qualified immunity. I conclude that, regardless of whether Barrett has established a violation of his First Amendment rights, defendants are entitled to qualified immunity because Barrett's rights were not clearly established at the time Barrett was sanctioned.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815 (2009). Resolving government officials' qualified immunity claims involves a two-step process: the court must decide 1) whether the plaintiff has alleged or shown a violation of a constitutional right; and 2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. Id. at 815-16. It is within the court's discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of a particular case. Id. at 818. See also Bull v. City and County of San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (en banc) ("It is within our sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.") (Internal citations and quotations omitted). Where the constitutional inquiry "involves a question which is highly idiosyncratic and heavily dependent on the facts," the court may proceed directly to the second prong and decide whether the right in question was clearly established. Mueller v. Auker, 576 F.3d 979, 994 (9th

Cir. 2009).

Whether a right is clearly established "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 129 S.Ct. at 822 (internal quotation and citation omitted); Delia v. City of Rialto, 621 F.3d 1069, 1078 (9th Cir. 2010). Barrett has the burden of demonstrating that the right allegedly violated was clearly established at the time of the incident, and the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Pearson, 129 S.Ct. at 822 (internal quotations and citations omitted). I conclude that neither Procunier nor Bradley, nor the cases cited in Belleque from the Third, Fifth and Eighth Circuits, articulate a clearly established First Amendment right entitling a prison inmate to communicate racial and ethnic slurs suggesting threats of physical harm against prison personnel in outgoing mail. Defendants are therefore entitled to qualified immunity.

Because the Magistrate Judge recommended summary judgment in defendants' favor, he did not reach defendants' contention that Barrett's transfer to a prison in Oklahoma in May 2007 rendered his claims for declaratory and injunctive relief moot. However, I conclude that they are.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000). The central issue in any mootness challenge is whether changes in the circumstances existing when the action was filed have forestalled any meaningful relief. West v. Secretary of Dept. of Transp., 206 F.3d 920, 925 (9th Cir. 2000). If the complaining party cannot obtain effective relief, any opinion as to the legality of the challenged action would be advisory. City of

Page 15 - OPINION AND ORDER

Erie, 529 U.S. at 287. See also B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.

1999) (former student with no plans to re-enroll in school could not maintain action to enjoin

high school officials from using drug sniffing dogs to search students, because there was no real

threat that defendants would again subject *him* to such a search).

Where injunctive relief is sought against future wrongful acts, there must be a strong

likelihood of future injury to plaintiff.  Steel Co. v. Citizens for a Better Environment, 523 U. S.

83, 109 (1998).  Barrett's transfer to another prison deprives him of sufficient stake in this

litigation.  There must be a solid basis for believing that a future injury will occur, to ensure that

plaintiff has a sufficient stake in the litigation. O'Shea v. Littleton, 414 U.S. 488, 497 (1974).  I

conclude that Barrett's claims for declaratory and injunctive relief are moot.

**CONCLUSION**

I ADOPT the Magistrate Judge's Findings and Recommendation in part, with the

modifications discussed here.  Plaintiff's motion for partial summary judgment (doc. # 47) is

DENIED.  Defendants' motion for summary judgment (doc. # 60) is GRANTED on the basis of

qualified immunity.  The Magistrate Judge's recommendation that defendants' motion to strike be

granted is not challenged and is ADOPTED.  This action is dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____1st_____ day of March, 2011.

___/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 16 - OPINION AND ORDER